HEARTWOOD, INC.; Jim Bensman; and Mark Donham, Plaintiffs,

v.

UNITED STATES FOREST SERVICE; and Michael Dombeck, Chief, United States Forest Service, Defendants.

No. 98–CV–4289–JPG.

United States District Court, S.D. Illinois.

Sept. 28, 1999.

Matt Kenna, Kenna & Hickcox, Durango, CO, for Heartwood, Inc, Jim Bensman and Mark Donham.

William E. Coonan, Asst. U.S. Atty., Fairview Heights, IL, Albert C. Lin, U.S. Dept. of justice Environmental & Natural Resources Div., Washington, DC, for U.S. Forest Service, Defendant.

Albert C. Lin, U.S. Dept. of Justice Environmental & Natural Resources Div., Washington, DC, Vince DeWitte, U.S. Dept. of Agriculture Natural Resources Div., Washington, DC, Marcia MacNaughton, U.S. Dept. of Agriculture, Washington, DC, for Mike Dombeck, Defendant.

### ORDER

GILBERT, Chief Judge.

Pending before the Court are the parties' cross-motions for summary judgment (docs. 20 & 21). Both parties responded (docs. 27 & 29) and replied (docs. 29 & 30).

This complaint is a three-count facial challenge to certain Categorical Exclusions ("CE's") promulgated by the Forest Service ("FS"), pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* At issue are new policies and procedures to replace those originally published in the Federal Register in June, 1985, (50 FR 26078), as well as a particular CE regarding timber harvests on FS land. The new policies and procedures were issued as Chapter 1950 of the Forest Service Manual ("FSM") and as Forest Service Handbook ("FSH") § 1909.15, Environmental Policy and Procedures Handbook. The challenged CE's were adopted purportedly pursuant to NEPA and the Administrative Procedures Act ("APA") and are described and contained in Forest Service Handbook ("FSH") 1909.15, Chapter 30, §§ 31.1b(2), (4) through (8), and §§ 31.2(1) through (9). The final rule adopting the challenged CE's, entitled "National Environmental Policy Act: Revised Policy and Procedures, AGENCY: Forest Service, USDA" was published in the Federal Register, Vol. 57, No. 182, on September 18, 1992.

The plaintiffs assert that the defendants acted contrary to law when they promulgated and adopted the challenged CE's by failing to follow all procedural requirements and mandates. The plaintiffs assert, therefore, that the challenged CE's are invalid on their face and should be declared null and void. The plaintiffs also ask the Court to grant specific injunctive relief and enjoin the defendants from utilizing the challenged CE's. The plaintiffs allege that the actions authorized under these challenged CE's may have a significant effect on the environment but have not been given the requisite hard look under NEPA.

The Court notes that this complaint does not challenge the FS' application of a CE. This complaint actually challenges the FS' adoption of the CE itself and the process by which the adoption took place. For all three counts, the plaintiffs ask the Court to (1) declare .the relevant CE's null and void and as violative of the APA and NEPA; (2) declare null and void all FS project decisions regarding these challenged CE's; and (3) issue a nationwide injunction against the FS undertaking or allowing any of the activities pursuant to the challenged CE's.

### I *Background*

### A. *NEPA*

NEPA is the "basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1. Its purpose is to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." Id. at 1500.1(c); *Fund for Animals v. Babbitt*, 89 F.3d 128, 130 (2nd Cir.1996). NEPA established a national policy of protecting the environment as a way of promoting human health. 42 U.S.C. § 4321.

**B. *CEO***

NEPA also created the Council on Environmental Quality ("CEQ"), which is the agency that administers NEPA and promulgates regulations related to NEPA that are binding on federal agencies. 42 U.S.C. § 4342; 42 U.S.C. § 4344(3); 40 C.F.R. §§ 1501–08. One of those regulations requires all federal agencies like the FS to adopt procedures implementing CEQ's regulations and provides that:

> "[w]hen the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the [CEQ] while developing its procedures and before publishing them in the Federal Register for comment. . . . The procedures shall be adopted only after an opportunity for public review and after review by the [CEQ] for conformity with the Act and these regulations . . ."

40 C.F.R. § 1507.3.

■ Reviewing courts give these CEQ regulations "substantial deference." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 1848–49, 104 L.Ed.2d 351 (1989); *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). These regulations require every federal agency to draft its own administrative regulations to implement and supplement the regulations promulgated by CEQ. 40 C.F.R. § 1507.3.

Together, CEQ and NEPA, have established a complex system for evaluating environmental management decisions and the environmental effects of proposed federal agency actions. *See* 40 C.F.R. Parts 1500–08. This system consists of environmental impact statements, environmental assessments and categorical exclusions. The Department of Agriculture adopted environmental regulations to fulfill its NEPA obligations, *see* 7 C.F.R. § 3100.41(e), and the FS Environmental Handbook is meant to be a layer of agency rules one level below these. *See* 7 C.F.R. § 3100.41(e); Environmental Handbook, section 01.3; *Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir.1998). CEQ directs agencies to establish implementing procedures to determine which actions "normally require[ ] an environmental impact statement." 40 C.F.R. § 1501.4(a)(1). Environmental impact statements are detailed reports completed after a thorough analysis and study. The CEQ regulations also direct agencies to adopt implementing procedures to determine which actions normally *do not* have any significant impact on the environment and so need not be the subject of any study or report; these actions are referred to as "categorical exclusions." 40 C.F.R. § 1501.4(a)(2); *Johnson*, 153 F.3d at 788.

Environmental impact statements ("EIS") are the most detailed form of analysis. Federal agencies like the FS must prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.3. Environmental assessments are concise public documents "that provide analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact on the environment." *Mahler v. U.S. Forest Service*, 927 F.Supp. 1559, 1570–71 (S.D.Ind.1996), *citing* 40 C.F.R. § 1508.9. "An environmental assessment must include discussions on the need for the proposal, other alternatives, the environmental impact of the proposal and its alternatives, and other information." *Mahler*, 927 F.Supp. at 1570–71. Agencies prepare EA's for several rea-

sons, including: (1) to provide evidence and analysis that determine whether or not to prepare an EIS or a Finding of No Significant Impact ("FONSI"); (2) to help the agency comply with NEPA when no EIS is necessary; and (3) to "[f]acilitate preparation of an [EIS] when one is necessary." 40 C.F.R. § 1508.9(a).

CEQ and NEPA regulations allow agencies to avoid the preparing either an EIS or an EA if a proposed action properly comes within a "categorical exclusion." NEPA regulations provide in pertinent part:

> "categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.

Federal agencies must adopt procedures for establishing CE's and must provide for "extraordinary circumstances" in which otherwise categorically excluded actions *would* require an EA or EIS; these extraordinary circumstances exceptions are for actions which may have a significant environmental effect despite their inclusion as a CE activity. The CE's at issue here are contained and described in 1909.15 of the FS Handbook ("FSH"), Chapter 30, §§ 31.1b(2), (4) through (8), and §§ 31.2(a) through (9).

A. *The complaint*

Count I asserts that the defendants violated C.F.R. § 1507.3, by failing to obtain the necessary review by CEQ of the challenged CE's prior to adopting them. In the process of promulgating FS NEPA procedures such as these, CEQ must review all CE's before the FS adopts them to assure the CE's compliance with CEQ and NEPA regulations. *See* 40 C.F.R. § 1507.3(a); 48 Fed.Reg. at 34,265. The plaintiffs assert in Count I that the defendants failed to obtain this required CEQ review.

Count II asserts that the defendants violated NEPA and the APA, 5 U.S.C. § 706, as well as CEQ and Department of Agriculture ("DOA") regulations when adopting the challenged CE's. The plaintiffs allege that these violations occurred by the following actions of the defendants: (1) failing to conduct an environmental assessment ("EA") and subsequently issuing a Finding of No Significant Impact ("FONSI"), or if a FONSI was not appropriate, by failing to conduct a more extensive environmental impact statement ("EIS"); (2) by failing to address or consider "extraordinary circumstances" before issuing the CE's; and (3) by utilizing a "case-by-case" CE procedure in part in an attempt to avoid NEPA requirements to give these actions the requisite hard look.

Count III challenges specifically the timber harvest CE. FSH 1909 .15, Chapter 30, Section 31.2(4); 57 Fed.Reg. at 43,209. The plaintiffs assert that the defendants violated NEPA and CEQ regulations, in particular, which state that categorically excluded actions must not "individually or cumulatively have a significant effect on the human environment" by failing to take a hard look at the environmental consequences and adequately consider and respond to public comments prior to the CE's adoption. 40 C.F.R. § 1508.4.

The plaintiff Heartwood, Inc., is a not-for-profit corporation that operates as a coalition of environmental organizations; plaintiff Mark Donham owns land and lives adjacent to the Shawnee National Forest ("SNF"); and plaintiff Bensman is a user of national forests.

B. *Procedural history*

The FS adopted the disputed revised policies and procedures for implementing NEPA and CEQ regulations on September 18, 1992, with the revisions effective September 21, 1992. *See* 57 Fed.Reg. 43,180 (AR Vol. I, Tab 13). These revised procedures included a set of CE's and examples of extraordinary circumstances which would preclude the application of a CE. *Id.* at 43,183, 43,208.

In its notice adopting the new policy and procedures, the FS stated:

Based on experience and environmental analysis, the implementation of the revised Forest Service environmental policy and procedures will not significantly affect the quality of the human environment, individually or cumulatively. Therefore, this action is categorically excluded from documentation in an environmental impact statement or an environmental assessment.

FSH 1909.15 and 40 C.F.R. § 1508.4.

The FS did not produce a formal document entitled Environmental Analysis ("EA") or Environmental Impact Statement ("EIS") for the new CE procedures.

The timber harvest CE is at the heart of this dispute. As adopted, the new CE in the FSH categorically excludes the following activities

Timber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,000 board feet or less of merchantable wood products; which requires one mile or less of low standard road construction (Service level D, FSH 7709 .56); and assures regeneration of harvested or salvaged areas, where required.

FSH 1909.15 Chapter 30, Section 31.2 subsection 4.

The FS gave notice on April 29, 1991, of its adoption of the revised policy and procedures for implementing NEPA and CEQ regulations. 56 Fed.Reg. 19,718 (Apr. 29, 1991). The FS proposed the new policy and procedures to replace those published in the Federal Register on June 24, 1985, (50 Fed.Reg. 26,078).

After the FS made the proposed new policies and procedures available for public comment, plaintiff Bensman submitted his comments on June 25, 1991, raising concerns about the proposed CE's, with plaintiff Donham submitting his comments on June 26, 1991. In a notice dated September 18, 1992, and published in the Federal Register, the FS announced that they had adopted the new NEPA/CE policies and procedures and that they would become effective September 21, 1992.

On December 17, 1997, Donham made a Freedom of Information Act ("FOIA") request to the FS for any correspondence between the FS and the CEQ about the process that culminated in the final new policies and procedures which the plaintiffs challenge in this complaint. The FS responded on July 9, 1998, that they could not locate any CEQ-related correspondence on this subject. Pursuant to FOIA, in a January 17, 1998, letter to the CEQ, Donham also requested records regarding the FS promulgation of these challenged NEPA rules. On January 26, 1998, the CEQ sent Donham nine documents related to these new rules, none of which were correspondence between the CEQ and the FS related to the challenged rulemaking process.

C. *Plaintiffs' assertions*

Plaintiffs assert in their complaint and motion for summary judgment that, in implementing the new policy and procedures, the FS violated NEPA and the APA, in three ways: (1) adopting the CE's in general without the required review by the Council on Environmental Quality ("CEQ"); (2) adopting the new NEPA procedures without first preparing an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS"); and (3) the issuance of a specific CE (FSH 1909.15, Chapter 31.2(4), for timber sales under two hundred and fifty thousand (250,000) board feet and for salvage timber

sales under one million (1,000,000) board feet), which the plaintiffs claim has significant cumulative effects on the human environment which exclude the timber harvesting as a CE. The complaint asks the Court to declare the disputed CE's null and void, enjoin their future use by the FS in approving agency actions, as well as enjoin any FS actions approved pursuant to the challenged CE's.

### D. *Defendants' assertions*

In their motion for summary judgment, the defendants assert that (1) the FS complied with CEQ's NEPA regulations by consulting with CEQ during development of the CE's and by obtaining proper CEQ review; (2) the FS properly concluded that preparation of an EA or EIS was not required in adopting the new CE's; (3) the referenced timber harvest CE does not violate CEQ regulations, as that CE's development reflects the FS's experience with the effects of timber harvests of various sizes and FS experience analyzing those effects; (4) the plaintiffs lack standing to bring their claims; and (5) their claims should be barred by the doctrine of laches due to unreasonable delay.

### II *Analysis*

### A. *Standard*

■ When reviewing administrative agency action, the court must limit its review to the materials that were before the agency at the time of its decision. *Cronin v. United States Dep't. of Agriculture,* 919 F.2d 439, 443–44 (7th Cir.1990). In general, a court may not overturn the decision of an administrative agency unless the court determines that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; ... [or] in excess of statutory jurisdiction, authority or limitations ..." 5 U.S.C. § 706(2)(A).

Title 5 U.S.C. § 706(2) provides that a reviewing court shall

hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of any agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706(2)(A).

■ In making the factual inquiry into whether an agency decision was arbitrary or capricious, the Court must consider whether the disputed decision was (1) based on a consideration of the relevant factors; or (2) whether there has been a clear error of judgment. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989).

"'The role of the courts [reviewing agency decisions under NEPA] is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Id.* (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983)). "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Id.*

■ In addition, a court will consider an agency decision as arbitrary and capricious

when based on entirely false premises or information. *Van Abbema v. Fornell,* 807 F.2d 633, 639 (7th Cir.1986). Furthermore, the failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct. *Simmons v. Block,* 782 F.2d 1545, 1550 (11th Cir.1986); *Bunyard v. Hodel,* 702 F.Supp. 820, 822 (D.Nev.1988). Courts generally subscribe a presumption of good faith to federal agencies, but parties may rebut the presumption. *Sierra Club v. Espy,* 822 F.Supp. 356, 361 (E.D.Tex.1993). In addition, courts generally defer to the "reasonable opinion" of agency experts in matters implicating conflicting expert opinions. *See Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

In making a decision on all of these issues, the Court must decide whether the FS has acted in an arbitrary and capricious manner. It is not the Court's duty to supplement its judgment for that of the Forest Service on matters within its expertise. *See Marsh,* 490 U.S. at 377, 109 S.Ct. 1851. However, it is important to note that in deciding whether an agency decision was arbitrary and capricious, the Court must consider whether that agency based its decision on a consideration of the relevant factors and whether the agency committed a clear error of judgment. *Id.* In doing so, the Court may not rely merely on the agency's expertise. To uphold the agency's decision, the Court must be convinced that the record contains adequate evidence supporting the agency's expert opinions and decisions as well as evidence upon which the agency states it relied in making its decisions. *See Van Abbema,* 807 F.2d at 639–641.

The Seventh Circuit applies the arbitrary and capricious standard when reviewing an agency's decision to implement actions governed by NEPA. *State of Wisconsin v. Weinberger,* 745 F.2d 412, 417 (7th Cir.1984); *River Road Alliance, Inc. v. Corps of Eng'rs of U.S. Army,* 764 F.2d 445, 449 (7th Cir.1985), *cert. denied* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).

The Supreme Court determined that an agency's decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *Southwest Center v. U.S. Forest Service,* 100 F.3d 1443, 1448 (9th Cir.1996).

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R Civ.P. 56(c). Upon the filing of a motion for summary judgment, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial. *Gracia v. Volvo Europa Truck N.V.,* 112 F.3d 291, 294 (7th Cir.1997); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of some alleged factual dispute is insufficient to defeat an otherwise properly supported motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where it is the task of the Court to review an administrative record and apply legal standards to that record, summary judgment is an appropriate vehicle for deciding the case. *Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994).

**B. *Standing***

The threshold issue of standing requires the Court to consider three factors:

(1) whether the plaintiff(s) in a given case can establish an injury in fact, i.e., a concrete, actual or imminent harm; (2) the harm must be fairly traceable to the conduct of the defendant; and (3) the harm must be capable of being redressed by the requested relief. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998). The Court finds that the plaintiffs in this case have standing to bring their action.

■ As stated in an earlier decision by this Court and affirmed by the Seventh Circuit, the Court grants standing to these plaintiffs because they do allege that they use and enjoy the FS lands upon which their claims are based, both in the Southern District of Illinois and elsewhere throughout the United States, and FS decisions here "will diminish this use and enjoyment." *Rhodes v. Johnson,* 153 F.3d 785, 787 (7th Cir.1998). This potential harm would result directly from the FS' lack of compliance with NEPA and federal regulations, so that the harms would be "causally connected" to the defendants' actions. *Id.* In addition, the Court finds that any remedy granted in this case is capable of redressing the alleged injury. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 1016–17, 140 L.Ed.2d 210 (1998).

### C. Laches

■ To succeed under the laches doctrine, the defendants must show: (1) the plaintiffs unreasonably delayed in bring their action; and (2) the defendants suffered prejudice as a result. *United States v. Administrative Enterprises, Inc.,* 46 F.3d 670, 672 (7th Cir.1995). The Court finds that the laches doctrine does not apply to bar the plaintiffs' claims in the instant case.

■ Generally, courts do not bar NEPA claims under the laches doctrine but instead apply the appropriate statute of limitations. The Court accepts the reasoning that in environmental cases like the instant one, the public and the government are better served by applying the statute of limitations. Although all parties might have been better served by an earlier lawsuit, the plaintiffs here have articulated a reasonable excuse for their "delay" in bringing suit, and the defendants have not shown sufficient prejudice to invoke the laches doctrine.

■ Since NEPA does include a private right of action, courts generally review NEPA claims under the APA. 5 U.S.C. § 702; *City of Evanston v. Regional Transportation Authority,* 825 F.2d 1121 1122, 1124 (7th Cir.1987); *Village of Thornton v. U.S. Army Corps of Engineers,* 31 F.Supp.2d 1060, 1062 (N.D.Ill. 1998). Although the Seventh Circuit has not ruled directly on the issue, numerous courts have ruled that the six-year time limit in 28 U.S.C. § 2401(a) applies to NEPA claims and that a complaint under the APA for review of an agency action is a "civil action" within the meaning of § 2401(a). *See Thornton,* 31 F.Supp.2d at 1062 (collecting cases); *see Village of Elk Grove Village v. Evans,* 997 F.2d 328, 331 (7th Cir.1993) (noting that other circuits have applied the six-year statute of limitations to APA suits.); *see Sierra Club v. Slater,* 120 F.3d 623, 630–31 (6th Cir.1997). These courts have held that the six-year statute of limitations in § 2401(a), therefore, applies to the APA. *See Daingerfield Island Protective Soc'y v. Babbitt,* 40 F.3d 442, 445 (D.C.Cir.1994). Section 2401(a) applies a six-year time limit to "every civil action commenced against the United States." *See Slater,* 120 F.3d at 631; *Sierra Club v. Pena,* 915 F.Supp. 1381, 1392–93 (N.D.Ohio 1996) (noting that laches generally applied to NEPA, but finding statute of limitations the "better reasoned" rule).

■ The statute of limitations under 28 U.S.C. § 2401(a) begins to run when the right of action first accrues, which, under the APA, is generally the time of the final agency action. 5 U.S.C. § 704; *Slater,* 120 F.3d at 631; *Village of Thornton,* 31 F.Supp.2d at 1062. In determining wheth-

er a particular agency action is final, "'[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Slater,* 120 F.3d at 631 (quoting Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992)). The Court finds that the adoption of the new CE's effective September 18, 1992, was a final agency action. 57 Fed. Reg. 43180. Therefore, the statute of limitations does not bar the action, and the Court will not apply the doctrine of laches.

### D. *Claims*

#### 1. *Count I—CEO consultation and approval*

■■■ Following consultation with the FS, CEQ must review and approve CE's before the FS adopts them to assure the CE's compliance with CEQ and NEPA regulations. *See* 40 C.F.R. § 1507.3(a); 48 Fed.Reg. at 34,265. The Court cannot locate nor does any party direct the Court's attention to any requirement that such approval be verified in writing. CEQ regulations provide:

> (a) ... [E]ach agency *shall* as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the Federal Register for comment ... The procedures shall be adopted only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations ... Agencies are encouraged to publish explanatory guidance for these regulations and their own procedures ...
>
> (1) Those procedures required by SS 1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

> (2) Specific criteria for and identification of those typical classes of action:
>
> (i) Which normally do require environmental impact statements.
>
> (ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (S 1508.4)).
>
> (iii) Which normally require environmental assessments but not necessarily environmental impact statements.

40 C.F.R. § 1507.3.

The plaintiffs asserted in their initial summary judgment memorandum that the FS failed to comply with CEQ regulations because the FS "never obtained written certification from the CEQ" that the CE's conformed with NEPA and CEQ regulations. *See* Pl's Mem., p. 20 (doc. 24). The plaintiffs also argued that the declarations on this issue from CEQ's General Counsel Dinah Bear and the FS's Director for Environmental Coordination David Ketcham were "extra-record evidence" that Court could and should not consider. *Id.* at 20–21 (doc. 24). The Court finds both of these assertions factually and legally incorrect. The Court has already addressed the plaintiffs' "extra-record" argument regarding these declarations and will not repeat its self-explanatory ruling here.

The Court cannot discover any case law nor federal regulation that requires CEQ to put its approval in writing. The plaintiffs request the Court to vacate the challenged CE's on this basis but do not provide the Court with any statutory nor case law support for their position. The defendants do, however, support their contentions with declarations from Bear and Ketcham that the FS did openly and frequently consult with the CEQ on the new procedures and that CEQ did find them to be in compliance with NEPA and CEQ regulations. *See* Bear Decl. ¶ 2–3; Ketcham Decl. ¶ 5–6. Plaintiffs argue that Bear's declaration that the "FS complied with all applicable requirements of the CEQ regulations in adopting its agency NEPA Procedures" is a legal conclusion

that the Court should disregard. The Court disagrees and finds that this portion of Bear's declaration is a factual statement. The Court finds that the record contains uncontradicted evidence that the FS consulted with and obtained approval by CEQ in compliance with 40 C.F.R. § 1507.3.

Accordingly, the Court **DENIES** the plaintiffs' summary judgment motion on Count I and **GRANTS** summary judgment in favor of the defendants (docs. 20 & 21).

### 2. *Count II—Preparation of an EA or EIS*

▆▆▆ The Court **GRANTS** summary judgment to the defendants and **DENIES** summary judgment to the plaintiffs on this count. The Court finds that the FS did not need to prepare an EA or EIS before adopting the new categorical exclusions.

NEPA requires that all agencies make a report on the "environmental impact of the proposed action" whenever the agency proposes action "significantly affecting the quality of the human environment." 42 U.S.C. S 4332(2)(C). CEQ regulations describe this report as an EIS. 40 C.F.R. § 1508.11, and direct agencies to establish implementing procedures to determine which actions "normally require[ ] an environmental impact statement." 40 C.F.R. § 1501.4(a)(1). (Environmental impact statements are detailed reports completed after a thorough analysis and study.)

CEQ regulations also direct agencies to adopt implementing procedures to determine which actions normally do not have any significant impact on the environment and so *need not* require a report; regulations refer to these as "categorical exclusions" ("CE"). 40 C.F.R. § 1501.4(a)(2). If a proposed action falls within a CE, the agency does not need to prepare either an EA or an EIS. If a proposed action does not fall within a CE, the agency must prepare an EA, 40 C.F.R. § 1501.4(b), which is "a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been

the kiss of death to many a federal project—is necessary." *Cronin v. United States Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir.1990).

An EA results in either a "finding of no significant impact" ("FONST") or a finding that a project will have a significant impact, in which case an agency must prepare an EIS. 40 C.F.R. § 1501.4(c) & (e); 40 C.F.R. 1508.9. An EA seeks to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an EIS. *See also* 33 C.F.R. § 230.10. Federal agencies like the FS must prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.3. Only if the EA indicates the likelihood of this significant environmental consequences, however, does an agency have to prepare an EIS, and the decision to not prepare an EIS will only be set aside if it was an abuse of discretion. *See Wisconsin v. Weinberger*, 745 F.2d 412, 417 (7th Cir.1984); *River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445 (7th Cir.1985).

Under NEPA and federal regulations, agencies use CE's to make the threshold determination through their own processes and procedures of which actions do not need an EA or an EIS. CEQ determines whether or not an agency's procedures for making this threshold determination violate NEPA. *See* 40 C.F.R. § 1507.3. The Court must describe as circular and unhelpful to the entire NEPA and CEQ procedure an argument that seeks to impose an EA or EIS requirement on the very process NEPA mandates. The Court understands that 40 C.F .R. § 1508.18, defines "major Federal action" to include "revised agency rules, regulations, plans, policies, or procedures" but also understands that this definition refers to actions for which an EIS is necessary, not to the CEQ-mandated implementing procedures to determine when an EIS is unnecessary, i.e., CE's.

On a practical note, the Supreme Court has stated that an agency need not prepare an EIS unless that agency's plans "ripen" into a "specific proposal [ ] for action," *Kleppe v. Sierra Club,* 427 U.S. 390, 401 n. 12, 96 S.Ct. 2718, 2726 n. 12, 49 L.Ed.2d 576 (1976), or into a "specific action of known dimensions." *Id.* at 402 n. 14, 96 S.Ct. at 2727 n. 14; *see also Wisconsin v. Weinberger,* 745 F.2d 412, 416 (7th Cir.1984). In addition, CEQ regulations provide that an EIS is unnecessary unless the agency's planning ripens into a "recommendation or report on proposals for legislation [or] other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. S 4332(2)(C). Significantly, courts generally hold that EIS's (which normally result from the preparation of an EA) must be "'written late enough in the development process to contain meaningful information,'" yet early enough so that they can "'practically serve as an input into the decision making process.'" *Public Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n,* 940 F.2d 679, 684, 291 U.S.App. D.C. 248, 253 (D.C.Cir.1991) (quoting *Scientists' Institute for Public Information, Inc. v. Atomic Energy Com'n,* 481 F.2d 1079, 1094 (D.C.Cir.1973)). The Court believes that this further supports the practical futility of requiring an EA or EIS at the initial point when CE's are being implemented, as those categorical exclusions are to guide agency decisions as to when the FS must prepare EA's and EIS's for particular actions.

The plaintiffs contend that the FS violated CEQ regulations when the FS failed to prepare an EA or an EIS for the new policy and procedures adopted in September, 1992. The FS argues that the process of adopting the new NEPA procedures was categorically excluded from the need for an EA or EIS because the procedures themselves do not authorize any activity or represent an irretrievable commitment of resources. *See* 57 Fed.Reg. at 43,186; 56 Fed.Reg. 19,718, 19,721 (1991); *see also* Def.'s Br. At 17–23.

Categorical exclusions are not actions themselves, nor are they proposals for actions, nor do they implement NEPA policy. Categorical exclusions are just that: "categories" of actions for which EA's or EIS's are not necessary. It stretches the Court's credulity to imagine how a list of categories could implicate an EA or an EIS. Analyzing the plaintiffs' claims in a practical sense, the Court cannot imagine how an EA or an EIS could be prepared for these various challenged CE's or what practical purpose such an EA or EIS would have. The adoption of a list of categories is not implementation of a specific policy or statutory program, nor a plan for action in any sense of the phrase. *See* "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed.Reg. 18,-033 (March 23, 1981) (Answer to question 24(a)). An EIS is the most detailed form of environmental analysis in the NEPA process. To propose that such a document be prepared for types (categories) of actions that do not concern a specific proposed action in a specific location seems beyond the Court's comprehension. The Court believes that preparation of an EA or EIS prior to the FS' adoption of these CE's would be meaningless and that the FS would find it impossible to accurately analyze the true potential environmental consequences of "categories" of actions. Any EA or EIS that resulted would surely be subject to challenge for being too speculative, vague and undetailed.

The FS identifies twenty (20) categories of actions which may be categorically excluded from documentation in an EIS or EA. See 56 Fed.Reg. 19,719–20. The FS asserts (and the plaintiffs do not dispute) that the 1992 revisions at issue in this lawsuit were developed in part to make the categories more specific and objectively identifiable, to clarify definitions of categories and to expand examples in order to facilitate understanding and interpretation of their use. *Id.* In addition, the 1992 revision added new categories and expanded existing ones. *Id.* In its arguments, the

FS explains that these new CE's were interpreted by the FS as NEPA procedures that constituted internal administrative policy and, as such, that was excluded from EA/EIS requirements under 7 C.F.R. § 1b.3(a)(1). CEQ regulations provide:

" . . . [w]hen the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the [CEQ] while developing its procedures and before publishing them in the Federal Register for comment. . . . The procedures shall be adopted only after an opportunity for public review and after review by the [CEQ] for conformity with the Act and these regulations . . ."

40 C.F.R. § 1507.3.

40 C.F.R § 1508.4 defines "categorical exclusions; 40 C.F.R. § 1507.3 outlines the process agencies must go through to establish implementing procedures for NEPA." Read together, these two regulations do not state that agencies must prepare EA's or EIS's when adopting CE's, despite the plaintiffs' strenuous assertions otherwise. 40 C.F.R. § 1508.4 merely defines CE's and references § 1507.3, as the regulation describing how agencies establish procedures to implement § 1508.4. In other words, in the overall NEPA implementation process, CEQ regulations (like § 1507.3 and § 1508.4) direct agencies like the FS to adopt implementing procedures to determine which actions normally do not have any significant impact on the environment and so need not be the subject of any study or report. *See* 40 C.F.R. § 1501.4(a)(2). Only if a proposed action does not fall under an existing CE, does the agency have to prepare an EA. *Id.*

It is interesting to note that the plaintiffs do not point the Court to any case law that supports their position, and in fact, concede in their response to the defendants' cross motion for summary judg-

ment, that this may be an issue of first impression. If that is the case, and the Court believes it is, the Court cannot and will not twist the words of these regulations nor plain common sense to require an EA or EIS to be prepared under these circumstances. The defendants point out (and the plaintiffs admit) that no other agencies prepare EA's or EIS's when promulgating CE's. The Court believes that there are sound, sensible reasons for that and disagrees with the plaintiffs that this just illustrates the result of the failure having never been challenged in court.

The Court must give great deference to CEQ's interpretation of NEPA. *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). The Court, therefore, agrees with the defendants that the fact that CEQ approved the challenged CE's does suggest that an EA or EIS was not required prior to the adoption of these revisions.

Therefore, the Court finds that the plaintiffs have not shown any legal or regulatory support for their contention that the FS should have conducted an EA or EIS prior to implementing these CE's. The Court also finds that any document prepared at that point in the FS' NEPA process would be too speculative and vague to include meaningful analysis. Accordingly, the Court **GRANTS** the defendants' motion for summary judgment on Count II and **DENIES** the plaintiffs' motion (docs. 20 & 21).

*3. Count III—Timber harvest CE*

In Count III, the plaintiffs challenge an individual CE relating to timber harvests. FSH 19090.15 Chapter 30, Section 31.2 sub. 4, 57 Fed.Reg. 43,209. Plaintiffs assert that this particular CE violates CEQ regulations which state that actions categorically excluded must not "individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4.

 This current, proposed CE excludes timber harvests removing up to

250,000 board feet of merchantable wood products and up to 1,000,000 board feet of salvaged merchantable wood products. The plaintiffs assert that the timber sale CE violates NEPA and CEQ regulations because the FS decision runs counter to the evidence before the agency, the FS failed to consider an important aspect of the problem (of timber harvesting) and the result "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

From 1985 until to August, 1987, the FS used a quite general timber harvest CE which related to "[l]ow impact silvicultural activities that are limited in size and duration and that primarily used existing roads and facilities" and which included tree salvage, thinning and small harvests. *See* 50 Fed.Reg. 26,081. In response to a request by the Wilderness Society and the Oregon Natural Resources Council to stay timber sales of twenty-five thousand (25,000) board feet or less or involving areas of more than one acre, the FS issued an interim directive to limit timber salvage, thinning and harvesting to less than one hundred thousand (100,000) board feet or less or to areas of less than ten (10) acres, 54 Fed.Reg. 9073–9075. The FS intended this interim directive to guide timber harvests on national forest land until more comprehensive revisions could be made to the FS' NEPA procedures.

When adopting the revised CE challenged in this lawsuit, the FS stated that the request to prohibit the categorical exclusion of timber sales of more than twenty-five thousand (25,000) board feet or involving more than one acre was "unreasonably conservative." 56 Fed.Reg. 19719. In the next sentence, the FS increased the categorical exclusion to one million (1,000,000) board feet limit for both live trees and salvage, when the proposed harvest would require one mile or less of new road construction. *Id.* In response to negative comments to that proposal, the FS reduced the live tree timber

harvest limit to two hundred and fifty thousand (250,000) board feet, keeping the salvage limit at one million (1,000,000) board feet.

The Court finds that the ten-fold increase in the board feet limit for salvage and the 2½ times increase in the harvest limit for live trees is a classic example of an arbitrary decision. The Court finds that the FS did not provide any rationale for why this magnitude of timber sales would not have a significant effect of the environment. The Court cannot find and the defendants do not direct the Court to any evidence in the record to support the huge increase in the board feet limit from the prior 100,000 limit, except to refer to the FS' expertise and prior experience with timber sales having "these characteristics." 56 Fed.Reg. 19719. That is not sufficient. The FS does not identify nor detail the characteristics to which it refers (road construction length, size of salvage or live tree harvests, etc.) and provides absolutely no other rationale to the Court to explain how and why the agency arrived at these figures. In addition, the FS does not provide any documentation nor evidence regarding the details of these prior harvests nor the FS' analysis of their environmental effects upon which they based their opinion.

In reviewing the plaintiffs' claim, the Court must evaluate the record to determine if the FS based its decision on a consideration of the relevant factors or whether there has been a clear error of judgment. *Id.* The Court must determine whether the FS acted in an arbitrary and capricious manner. As stated elsewhere in this Order, the Court does not intend nor seek to decide if it would have made the same decision. *See Marsh*, 490 U.S. at 377, 109 S.Ct. 1851. In evaluating the FS' decision, however, the Court must carefully review the record and be satisfied that the FS made a "reasoned decision" based on all the relevant factors and information. *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. Consequently, the FS must

explain its decision adequately so that the Court can determine that it was not arbitrary. In doing so, the Court may not rely merely on the agency's expertise. *Id.* To uphold the agency's decision, the Court must be convinced that the record contains adequate evidence supporting the agency's expert opinions and decisions, as well as evidence upon which the agency states it relied in making those decisions. *See Van Abbema,* 807 F.2d at 639–641. When discussing an agency's fulfillment of its NEPA obligations, CEQ regulations state clearly that the record must contain the relevant environmental documents supporting the agency's decision. *See* 40 C.F.R. § 1505.1. That is what is missing from this record.

What the record does contain is documentation from the FS' own Timber Salvage Task Force's Report and Recommendation, dated March 31, 1992, that runs counter the FS' decision. That report recommended two alternative options that would have either (1) kept the 100,000 board feet limit for both live tree and salvage sales but eliminate the acreage criteria; or (2) expand the volume to 200,-000 to 300,000 board feet for salvage only, keeping the live tree harvest limit at 100,-000. The report noted that the draft FSH published in the Federal Register in April, 1991, increased the volume requirement to one million board feet, but that public comments were strongly opposed to this harvest level for a categorical exclusion.

The defendants do not address the discrepancy between this recommendation by one of its own internal task forces nor do they explain at all the rationale for increasing the board feet limits so drastically, especially in light of the overwhelming opposition from both federal and state sources as well as the general public commentary. AR Vol IIb, Tab 8, p. 94. (The FS admits that 75 % of the comments they received in response to the proposed timber harvest CE were negative and favored much lower volume limits.). The Court is unpersuaded by the FS' argument that the proposed timber harvest CE reflects a "considered response to public comment."

*See* Def's Response, p. 26. Even though the FS stated that it decreased the board feet limit for live trees sales to 250,000 in response to the negative public comment, a careful reading of the public comments as well as the FS' summary of those comments indicates that most commentators (public and private) did not limit their criticism to just the live tree harvest portion of the CE. The record fails to account for the large number of public comments that addressed concerns regarding wildlife habitat usage and potential fragmentation, as well as other environmental impacts that could occur from both types of timber sales. Most respondents did not distinguish between the environmental effects of live tree harvests and salvage sales, and the FS failed to adequately address this issue and in fact, failed to address the issue of potential negative effects on wildlife at all. *See* 56 Fed.Reg. 19719–21.

In addition, the Court believes that the FS failed to adequately address or provide support for its position that the timber harvests of these magnitude would not have cumulative effects on the environment " 'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions...." 40 C.F.R. § 1508.7. The Court does not accept the circular argument that the extraordinary circumstances provision (FSH 1909.15 § 30.3(3)) adequately addresses the issue of cumulative effects. Significantly, 40 C.F.R. § 1504.8 allows categorical exclusions only for categories of actions that have been found to *not have* individual or cumulative effects on the environment. The extraordinary circumstances provision is designed to be applied to *already-existing* categorical exclusions, which by definition must have *already been found* to not generally have "cumulative effects." The FS is mandated to consider these cumulative effects *prior* to the implementation of a CE, not afterward. The Court cannot discover any meaningful analysis providing support for the FS' conclusion that the

categorical exclusion of timber harvests of this magnitude would not have cumulative effects on the environment.

Similarly, the FS fails to persuade the Court that the documentation and administrative appeals process supports the timber harvest CE. These provisions are irrelevant to the FS's initial decision to find that timber harvests of this size should be categorically excluded. And although the mandatory project or case files may include supporting documentation for a given project, the files are significantly different in emphasis and purpose from an EA, which evaluates a project's potential environmental impact. The documentation referred to by the FS is not used to assess the environmental impact of an action but used primarily to support the agency's decision to go forward with a project. Although the FS uses the decision memorandum requirement to support the timber harvest CE, the FS concedes that these decision memoranda were intended to merely *"memorialize* the categorical exclusion of a proposed action from further NEPA documentation." (Emphasis added) (*See* Def's Response, p. 6). The documentation requirements and administrative appeals process do not support the FS's initial decision to implement the timber harvest CE.

In sum, the Court finds that the FS failed to adequately consider an important aspect of the issues involved, offered little explanation for its decision and failed to provide adequate evidence and support for its decision to greatly increase the volume limit for and implement the proposed timber harvest CE. Therefore, the Court finds the FS' decision arbitrary and capricious and **DECLARES** the timber harvest **CE NULL AND VOID.** The timber sale CE is invalid under NEPA and should be set aside under the APA. 5 U.S.C. § 701 et seq.

Accordingly, the Court **GRANTS** summary judgment to the plaintiffs on Count III and **DENIES** summary judgment to the defendants (docs. 20 & 21)

### III *Remedy*

■ The defendants assert that even if the Court were to grant the plaintiffs relief on their claims, a nationwide injunction would be inappropriate and too far-reaching. Defendants claim that such an injunction would be "extraordinarily broad relief" that would be disproportionately punitive to the defendants, especially considering the long delay in bringing this suit, and that would threaten a wide variety of FS activities. The Court notes that because the FS procedure at issue in this suit implicates nationwide, not just local, FS policy, any remedy ordered also must be national in scope. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *National Mining Assn. v. U.S. Army Corps of Engineers,* 145 F.3d 1399, 1409, 330 U.S.App.D.C. 329, 339 (C.A.D.C. 1998) (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989)).

In the context of a permanent injunction, the Court may use its equity powers to flexibly provide an appropriate remedy. In exercising this "sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Wisconsin v. Weinberger* 745 F.2d 412, 425 (7th Cir.1984). Traditional equity standards govern whether or not to grant injunctive relief in a NEPA case. *See Conservation Law Foundation, Inc. v. Busey,* 79 F.3d 1250, 1271 (1st Cir.1996); *Sierra Club v. Marsh,* 872 F.2d 497, 503–04 (1st Cir.1989). To justify a permanent injunction, the plaintiffs must prove that they had no other adequate remedy at law. *Walgreen Co. v. Sara Creek Property Co.,* 966 F.2d 273, 274 (7th Cir.1992). The Court is convinced that no adequate remedy at law exists for these plaintiffs, and the defendants do not argue otherwise.

In deciding whether to issue an injunction, courts may apply their traditional equity principles, such as the nature of the

suit, the enforceability of an injunction, the existence of irreparable harm if an injunction were not granted and a balancing of the harms. The Court is not convinced that it must actually balance the harms in order to issue an injunction in this case, but will proceed to do so based on the pleadings and voluminous record already on hand. *See United States v. Bethlehem Steel,* 38 F.3d 862, 868 (7th Cir.1994) (quoting *Illinois v. Milwaukee,* 599 F.2d 151, 166 (7th Cir.1979), rev'd on other grounds), 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (stating that when the issues involve public health, "injunctive relief is proper, without resort to balancing.) NEPA requirements certainly implicate and, in fact, were implemented to protect the public health. 42 U.S.C. § 4321." Nevertheless, the Court will attempt to balance the harms in arriving at its decision. The Court **DENIES** the defendants' request for a hearing on balancing the harms.

The Court recognizes that in balancing the harms resulting from an injunction against the timber harvest CE that many private and public interests will be affected. The Court further recognizes that it is not mandated to issue an injunction in NEPA cases. The Seventh Circuit has stated that "[a]lthough the goal of NEPA is to force agencies to consider the environmental consequences of major federal actions, ... that goal is not to be achieved at the expense of a total disregard for countervailing public interests." *Wisconsin v. Weinberger,* 745 F.2d 412, 426 (7th Cir.1984). *Weinberger* further stated that NEPA "recognizes that agencies may decide to subordinate environmental values to other social values with which they sometimes compete." *Id. Weinberger,* however, involved a specific action approved by the Department of the Navy and challenged for the Navy's failure to prepare an EIS. In the instant case, the plaintiffs made a facial challenge to a NEPA implementing regulation, not to a specific approved action already underway. In addition, unlike the instant case, the Court of Appeals in *Weinberger* found the

agency's conduct was *not* arbitrary or capricious. Further, the Seventh Circuit stated that even if they had found the Navy had violated, the injunction would not be appropriate in part because of national defense interests.

*Weinberger* is helpful to this Court, however, in that the Seventh Circuit clearly stated that each "court should tailor its relief to fit each particular case, balancing the environmental concerns of NEPA against the larger interests of society that might be adversely affected by an overly broad injunction." *Id.* In tailoring that relief, courts should consider "the degree to which the NEPA interest would, in fact, be served by an injunction, [as well as] the efficacy of other forms of relief ..." *Id. Weinberger* also emphasized that equity provides courts with great flexibility in fashioning remedies appropriate to the circumstances of each case, *Id.; see also United States v. Marine Shale Processors,* 81 F.3d 1329, 1359 (5th Cir.1996).

Congress has imposed on federal agencies a decisionmaking process that is outlined in NEPA. NEPA's purpose is to ensure that agencies integrate environmental concerns into their decisionmaking. *See Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 142–43, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981). When agencies' actions and decisions violate this NEPA procedure, the harm has already been suffered, and the proper course for Courts is to redress this harm through injunctive relief. *Com. of Massachusetts v. Watt,* 716 F.2d 946, 952 (1st Cir.1983). NEPA prescribes and outlines procedural mandates that agencies must follow to meet their NEPA obligations. When agencies fail to adhere to that framework and act arbitrarily and capriciously in implementing their NEPA obligations, the harm suffered is not merely a procedural harm, but is " 'the added risk to the environment that takes place when governmental decision makers make up their minds without having before them an analysis ... of the likely effects of their

decision upon the environment.'" *Busey,* 79 F.3d at 1271–72 (quoting *Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir.1989)).

In *United States Environmental Protection Agency v. Environmental Waste Control, Inc.,* 917 F.2d 327, 332 (7th Cir.1990), the Seventh Circuit recognized that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Having found the FS' conduct unlawful, as it was arbitrary and capricious, the Court believes that the continued application of this unlawful CE does pose a potential danger both to the environment and to public health. The potential danger to the environment is possibly irreparable if further review of the timber harvest CE results in lower volume limits for future timber harvests and salvage. The Court will not presume to guess how the FS will revise the voided CE nor what the revised CE will say. Similarly, the Court is not expressing an opinion regarding the outcome, except to state the obvious requirement that any subsequent timber harvest CE must comply with statutory and regulatory mandates. The harms claimed by the plaintiffs are simply not redressable once the timber harvest CE's authorize harvesting, thinning and salvage projects.

The harm to the defendants in this case involves agency time, effort and resources to fashion a lawful timber harvest CE. The Court believes that that time, effort and resources is merely the price to pay for correctly implementing the FS' NEPA obligations. Additionally, the Court recognizes that there will be costs, both in time and finances, to reformulate or postpone timber harvest contracts that have been entered into since September, 1998, when the plaintiffs first filed suit. It was partly this consideration—that the private parties involved as well as the FS would not have to re-draft or re-frame contracts that are already several years old—that persuaded

the Court to limit this injunctive relief to the most recent time period. All parties have been on notice, however, since September 16, 1998, that any timber harvest contracts issued under this particular CE potentially could be declared void. The Court considers any resulting prejudice to be a natural and unavoidable outcome and finds that it does not weigh against granting the injunction.

Defendants argue that NEPA does not mandate that its procedural requirements be elevated above all other national considerations (*See* Def.'s Response, p. 30 (quoting but not citing to *Wisconsin v. Weinberger,* 745 F.2d 412 (7th Cir.1984))). The Court finds, however, that the procedural requirements violated here are substantive mandates that prescribe how federal agencies must implement NEPA's basis purposes. Therefore, to enjoin further action under a voided procedure does not elevate NEPA's procedural requirements above all other national considerations but instead seeks to require the FS to correctly implement its NEPA mandate.

NEPA established a national policy of protecting the environment as a way of promoting human health. 42 U.S.C. § 4321. In any balancing of harms, the public's interest must be considered as the underlying purpose for these regulations. The Court believes that the public interest is naturally harmed when agencies act arbitrarily to implement NEPA policy. In this case, the harm to public interests merges with both the plaintiffs' and the defendants' positions somewhat but weigh more toward granting the injunction. NEPA protects the public interest, and in fact, was promulgated to do just that. The Court finds that it is not even arguable that violations by federal agencies of NEPA's provisions as established by Congress harm the public as well as the environment. In a case involving hundreds and possibly thousands of acres of national forest land, the potential harm may be irreparable to society's use, enjoyment and health benefits of these lands. Of course,

the public also has an interest in efficiency and proper administration of federal agencies, and the Court does not take lightly that interest in avoiding unnecessary paperwork and agency man-hours. The public also has an economic interest in the products and services offered by and through the timber harvesting itself as well as the contracts with the FS. Again, in recognition of the burden an overly comprehensive injunction could cause, the Court will seek to tailor any injunctive relief to the narrowest time frame possible. The Court does not find any significant countervailing public interest that sufficiently weighs against an injunction in this case. While the public's interests overlap both for and against the injunction, the Court finds that it can best protect and preserve the public's interest by issuance of the injunction. Contracts can be rewritten, agencies can find cost-effective methods of conducting their business and all can continue to operate once the FS issues an unarbitrary and well-supported timber harvest CE. But the Court believes that the potential irreparable injury to the public from applications of an arbitrarily-issued CE is far greater.

Finally, the defendants claim that a nationwide injunction is geographically overly broad in scope, arguing that the plaintiffs "have not demonstrated a 'personal stake' in all circumstances in which CE's are applied or may be applied in the future." Simply put, the defendants assert that these plaintiffs lack standing to seek and receive a nationwide injunction as a consequence of their claims. Having already addressed the standing issue above, the Court will not reiterate it here, except to state that the Court finds that a nationwide injunction against this individual CE is not geographically overly broad in scope. Because the Court finds the timber harvest CE unlawful under NEPA, the Court may not enjoin its application in just a narrow, geographic area. The FS intended the challenged CE to be applied nationwide on all FS lands, so in finding the CE unlawful, the Court sees no option but to enjoin its application nationwide.

To do otherwise would invite further needless litigation on this particular CE, and the Court chooses to avoid that consequence. The Court does recognize, however, that the challenged CE was promulgated in 1992, and that many individual projects may have been approved already and perhaps are already in operational stages. For that reason, the Court will limit its injunction to those projects for which the FS did not issue approval prior to the instigation of this lawsuit in September, 1998.

The Court finds that the plaintiffs have met their burden. The Court finds that in considering the various harms to result from an injunction, the balance of factors weighs in favor of a nationwide injunction against the timber harvest CE. Enjoining further action under the voided CE is the only method by which the Court can redress the irretrievable potential harms and implement its Order.

Accordingly, the Court **DECLARES NULL AND VOID** FS project decisions approved relative to the timber harvest CE (FSH 1909.15, Chapter 30, § 31.2(4)) since September 16, 1998, and **ENJOINS** further actions through the application of the timber harvest CE.

IV *Conclusion*

The Court makes the following rulings on the plaintiffs' and defendants' motions:

1. Counts I and II—**GRANTS** summary judgment to the defendants and **DENIES** summary judgment to the plaintiffs (docs. 20 & 21);

2. Count III—**GRANTS** summary judgment to the plaintiffs and **DENIES** summary judgment to the defendants (docs. 20 & 21).

**IT IS SO ORDERED.**

### *JUDGMENT IN A CIVIL CASE*

This action came before the Court on cross-motions for summary judgment. After considering the motions and a decision having been duly rendered;

**IT IS ORDERED AND ADJUDGED** that summary judgment shall be **GRANTED** in favor of the plaintiffs and against the defendants on Count III. **IT IS FURTHER ORDERED AND ADJUDGED** that summary judgment shall be **GRANTED** in favor of the defendants and against the plaintiffs on Counts I and II.