**HABITAT EDUCATION CENTER, INC., David Zaber, and Ricardo Jomarron, Plaintiffs,**

v.

**Dale BOSWORTH, Chief of the United States Forest Service, and Mike Johanns, Secretary of the United States Department of Agriculture,[1] Defendants.**

No. 04–C–0254.

United States District Court, E.D. Wisconsin.

March 31, 2005.

---

1. Defendant Johanns recently succeeded Ann Veneman as Secretary of Agriculture. I have amended the caption accordingly.

Howard Learner, Sean O'Bosak, Brady Williamson, Shannon Fisk, for Plaintiff or Petitioner.

Benjamin Longstreth, David Oberstar, for Defendant or Respondent.

### DECISION AND ORDER

ADELMAN, District Judge.

## I. NATURE OF CASE

Plaintiff Habitat Education Center, Inc., a citizen's organization engaged in forest, wildlife, and natural resource protection,

and two of its officers, bring this action against defendants, Dale Bosworth, Chief of the United States Forest Service, and Mike Johanns, Secretary of the United States Department of Agriculture (collectively "the Forest Service"). Plaintiffs allege that in approving logging activities and timber sales in the McCaslin area ("the McCaslin project") of the Chequamegon–Nicolet National Forest ("CNNF") in northern Wisconsin, the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687.

■ Plaintiffs allege that the Forest Service violated NEPA by: (1) failing to adequately consider the cumulative impacts on the environment of past, present and reasonably foreseeable future logging projects; and (2) failing to consider sound, high quality scientific information indicating that the McCaslin project will harm goshawk and red-shouldered hawk, which species are in severe decline. Plaintiffs contend that the Forest Service violated NFMA by: (1) approving the McCaslin project based on an outdated 1986 forest plan; and (2) allowing greater road density in the McCaslin area than the 1986 plan permitted. Plaintiffs bring the action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which permits persons who are adversely affected by the action of a federal agency to obtain judicial review of such action. *See Sierra Club v. Marita,* 46 F.3d 606, 610 n. 3 (7th Cir. 1995). Plaintiffs have standing to sue because they allege that the Forest Service's actions will diminish their use and enjoyment of the CNNF. *See Rhodes v. Johnson,* 153 F.3d 785, 787 (7th Cir.1998). Before me now are the parties' cross-motions for summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The CNNF comprises two areas, the Chequamegon, which covers 858,400 acres in northwestern and north-central Wisconsin and the Nicolet, which covers 661,400 acres in northeastern Wisconsin. Prior to 1993, the Forest Service managed the areas separately but has since treated them as a single unit. In 2000, the Forest Service began planning a timber harvesting project in the McCaslin area on the Nicolet side of the CNNF, and in 2001, pursuant to NEPA, it requested public comments on the scope of the environmental impact statement ("EIS"). It subsequently prepared a draft EIS, in which it evaluated five alternatives for conducting the harvest and solicited public comments. *See* 40 C.F.R. § 1503 (requiring an agency to solicit public comments after preparing a draft EIS, but prior to preparing a final EIS).

In September 2003, the Forest Service signed the record of decision ("ROD") and released the final EIS in which it stated that it chose an alternative that created "desired vegetation conditions while striking a balance between issues of providing for interior forest and aspen communities and forest products." (R. DD–3, ROD at 1.) In 2003, the Forest Service also approved five other timber harvesting projects in the CNNF, one, the Northwest Howell project, on the Nicolet side and four, the Cayuga, Gilman Tornado, Hoffman Sailor and Sunken Moose projects, on the Chequamegon side. In November 2003, plaintiffs administratively appealed, and in December, the parties unsuccessfully attempted to resolve the dispute informally.

I will discuss additional facts in the course of the decision.

## III. STANDARDS OF REVIEW

As stated, the parties bring cross-motions for summary judgment under Fed. R.Civ.P. 56. However, in cases like the present one in which a district court reviews the action of an agency and thus performs an essentially appellate function, a summary judgment motion is an imperfect vehicle. *See Primeco Pers. Communications, Ltd. P'ship v. City of Mequon,* 242 F.Supp.2d 567, 574 (E.D.Wis.2003) (noting that in cases involving review of municipal decisions under the Telecommunications Act, "district courts sit in an appellate capacity, much as in Social Security cases where they review the decisions of administrative law judges"); *see also Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1501 (10th Cir.1992) (Kane, J., concurring) (pointing out that summary judgment motions in social security cases are unnecessary); *Vaile v. Chater,* 916 F.Supp. 821, 823 n. 2 (N.D.Ill.1996) (in a Social Security case, treating the Commissioner's motion for summary judgment as a motion to confirm the Commissioner's decision). The purpose of a summary judgment motion is to determine whether a case should proceed to trial, but in a case where a court reviews an agency decision, the "trial," such as it was, has already taken place. Further, in the present case, the standard of review is not whether there is a genuine issue of material fact, as it is under Rule 56, but whether the agency's decision was "arbitrary and capricious" under the APA. *See e.g., Env't Now! v. Espy,* 877 F.Supp. 1397, 1421 (E.D.Cal.1994) (noting that when the court reviews an agency decision "[t]he question is not whether there is a genuine issue of material fact, but whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole"). The Federal Rules do not seem to provide an appropriate mechanism for challenging an agency's decision. Nevertheless, I believe that a simple motion stating the relief requested should be sufficient. I will therefore treat plaintiffs' motion as one to reverse the Forest Service's approval of the McCaslin project and the agency's cross-motion as one to affirm.

I review challenges to agency action under NEPA and the NFMA according to the standard provided in the APA. *See Highway J. Citizens Group v. Mineta,* 349 F.3d 938, 952 (7th Cir.2003) (reviewing NEPA claim); *Ind. Forest Alliance, Inc. v. U.S. Forest Serv.,* 325 F.3d 851, 859, 862 (7th Cir.2003) (reviewing NFMA claim). As stated, under such standard, I may set aside an agency's action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), 706(2)(D). This standard of review is narrow and requires that I "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Highway J Citizens Group,* 349 F.3d at 952–53 (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations omitted)). I may not substitute my judgment regarding the environmental consequences of an action for that of the agency. *Id.* at 953. However, I must "insure that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Thus, if

> an agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]

the agency has violated the APA. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ When interpreting NEPA, I must give "substantial deference to the regulations issued by the Council on Environmental Quality" ("CEQ"). *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir.2003) (citing 42 U.S.C. § 4342). "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act." *Id.* (citing 42 U.S.C. § 4332(1) and *California v. Block*, 690 F.2d 753, 769 (9th Cir.1982)). "Grudging, pro forma compliance will not do." *Id.* (citation omitted).

■ A plaintiff challenging agency action under NEPA or the NFMA bears the burden of proof. *Marita*, 46 F.3d at 619. Finally, in reviewing agency action under the APA, I "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The scope of review is thus necessarily limited to the administrative record before the agency decisionmaker. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

### IV. NEPA CLAIMS

Congress enacted NEPA to foster better decisionmaking and informed public participation in actions that affect the environment. 42 U.S.C. § 4321 *et seq.* To achieve this goal, NEPA requires that federal agencies prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must include a "detailed statement" concerning "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided" and alternative proposals that could

minimize the adverse impacts or enhance the quality of the environment. *Id.* Finally, the EIS must include an analysis of the "relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity" and a list of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action." *Id.* NEPA requires analysis and public disclosure of significant environmental effects in order to ensure informed public decisionmaking, but it does not require that agencies select any particular decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

### A. Cumulative Impacts Analysis

The CEQ regulations implementing NEPA require that an EIS include a discussion of environmental impacts, including impacts that are direct, indirect and cumulative. 40 C.F.R. § 1508.25. "Cumulative impact" is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. With respect to the Forest Service's cumulative impacts analysis, plaintiffs allege: (1) that the Forest Service unreasonably determined the geographic area in which to conduct the analysis; (2) that in assessing the cumulative impacts of the McCaslin project, the Forest Service failed to evaluate the effects of the five other timber sales that it approved at about the same time; (3) that the Forest Service failed to analyze the cumulative

impacts in sufficient detail; and (4) that the Forest Service failed to identify past projects that contributed to the cumulative impacts. I address these contentions below.

## 1. Determination of Area in Which to Conduct Analysis

 The "identification of the geographic area" within which a project's cumulative impacts on the environment may occur "is a task assigned to the special competency of the appropriate agencies." *Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718; *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir.2002) (deferring to agency's determination of the scope of its cumulative impact review). Nevertheless, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir.2002). Thus, "[a]n agency must provide support for its choice of analysis area and must show that it considered the relevant factors." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir.2002). Relevant factors include "the scope of the project considered, the features of the land, and the types of species in the area." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958 (9th Cir.2003). The presence of species habitat outside the project area is also a relevant

consideration in determining the geographic scope of a cumulative impacts analysis for wildlife. Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* 15 (January 1997), *available at* http://ceq.eh.doe.gov/nepa/ccenepa/sec2.pdf (last viewed Mar. 31, 2005).

 In the present case, the Forest Service analyzed the McCaslin project's cumulative impacts on wildlife including red-shouldered hawk[2] and goshawk,[3] both of which the Regional Forester designated Regional Forester Sensitive Species ("RFSS"),[4] in "an area extending approximately two miles around the McCaslin project area boundary" ("project area plus two"). (R. DD–3, EIS at 103–04.)[5] In deciding to conduct the analysis within this area, the Forest Service did not consider all relevant factors. The agency states in the EIS that it chose the project area plus two boundary because "the scale is large enough to address habitat and movement concerns for species that use relatively large home ranges," and "because it includes the scale at which vegetation analysis was evaluated and most of the potential impacts to wildlife come from vegetation management." (*Id.*) As previously noted, in determining the geographic area in which to conduct a cumulative impacts analysis for wildlife, an agency should con-

---

**2.** The red-shouldered hawk is an uncommon bird found in mature lowland forests. It is about seventeen inches long, has a forty inch wing span, nests in tall trees and feeds mainly on reptiles, amphibians, small mammals, and birds. David Allen Sibley, *The Sibley Field Guide to Birds of Eastern North America* 100 (2003).

**3.** The northern goshawk is an uncommon to rare bird, which is found in small numbers in forests. It is approximately twenty-one inches long and has a forty-one inch wing span, nests in tall trees and feeds mainly on grouse, rabbits and squirrels. Sibley, *supra*, at 96.

**4.** RFSS are "those plants and animal species identified by a Regional Forester for which population viability is a concern as evidenced by significant current or predicted downward trend in numbers and density" and "habitat capability that would reduce a species existing distribution." (R.DD–3, App. D at 20.) A Regional Forester is the Forest Service official charged with administering a region of the National Forest system.

**5.** The Forest Service chose a different geographic area in which to analyze the impact of the project on each type of resource considered, including soil, water, vegetation and wildlife.

sider the presence of and effect on species outside the project area. *Considering Cumulative Effects, supra*, at 15. It is undisputed that wildlife, such as red-shouldered hawk and goshawk, reside in habitat scattered throughout the CNNF. Thus, the McCaslin project in combination with the five other projects could impact the entire population of red-shouldered hawk and goshawk residing in the CNNF. The five other projects are therefore relevant factors, and, in identifying the area in which to conduct its cumulative impacts analysis for wildlife, the Forest Service should have considered them.[6] By failing to do so, the Forest Service acted arbitrarily.

█ Moreover, even assuming that the Forest Service considered the other projects in determining the area in which to conduct the cumulative impacts analysis, the EIS is insufficient because it does not disclose that the Forest Service did so. Congress intended that "each federal agency spearheading a major federal project ... put on the table, for the deciding agency's and for the public's view, a sufficiently detailed statement of environmental impacts and alternatives so as to permit informed decisionmaking." *Lands Council v. U.S. Forest Serv.*, 379 F.3d 738, 744 (9th Cir.2004). EISs promote NEPA's purposes by ensuring "that the agency takes a 'hard look' at the environmental consequences of its proposed action" and by making "information on the environmental consequences available to the public, which may then offer its insight to assist the agency's decision-making through the comment process." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285–86 (1st Cir. 1996). Thus, NEPA required the Forest Service to include in the EIS an adequate justification for its choice of a geographic area in which to conduct its analysis, including evidence establishing that it considered all relevant factors. In the present case, the EIS does not even mention the other five timber projects and thus does not demonstrate that the agency considered them. Therefore, the Forest Service did not give the public the opportunity to assist its decision-making on this issue through the comment process.[7]

## 2. Consideration of Other Projects

█ The requirement that an agency discuss in the EIS the cumulative impact of an action prevents it "from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C.Cir.1988) (citations omitted). Thus, in some cases, courts have held that the Forest Service must analyze the cumulative impact of contemporaneous activities within a region. *See, e.g., Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306–08 (9th Cir. 2003); *Native Ecosystems Council*, 304 F.3d at 896; *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir.1990). Plaintiffs argue that the Forest Service did

---

6. Documents in the administrative record suggest that the populations of red-shouldered hawk and goshawk on the Chequamegon and Nicolet sides of the forest do not intermingle. (*See* R.2004, 2154.) However, the Forest Service produced such documents in response to comments on the draft EIS. Thus, there is no evidence in the record that the Forest Service considered them in determining the area within which to conduct the cumulative impacts analysis.

7. My conclusion that the Forest Service should have considered the five other projects in determining the area in which to conduct the cumulative impacts analysis does not necessarily mean that the area it chose was unreasonable but, rather, that in making the decision it did not consider all relevant factors. (*See* R.2004, 2154.)

not adequately analyze the cumulative impacts of the McCaslin project because it did not consider the environmental impact on wildlife, particularly red-shouldered hawk and northern goshawk, of the other five projects. However, as previously discussed, the agency should have considered the other projects in determining the geographic area in which to conduct the analysis, and because it failed to do so (and for other reasons), the case must be remanded for such consideration. Thus, it would be inappropriate for me to decide whether the Forest Service must consider the other projects in determining the cumulative impacts on wildlife because to do so would require that I determine the appropriate area in which the Forest Service should conduct the cumulative impacts analysis. Such determination must be left to the agency after consideration of all relevant factors. *See Marita,* 46 F.3d at 619 (noting that "[t]he court is not empowered to substitute its judgment for that of the agency").

### 3. Sufficiency of Analysis

■ The cumulative impacts analysis must be sufficiently detailed to be "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts and must rely on some quantified or detailed information." *Lands Council v. Vaught,* 198 F.Supp.2d 1211, 1245 (E.D.Wash.2002). Without quantified or detailed information, "neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1379–80 (9th Cir. 1998). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380. In the present case, plaintiffs allege that inso-

far as it relates to red-shouldered hawk, goshawk and certain rare plants, the cumulative impacts analysis was inadequate because it consisted mainly of overly general information.

### a. Red–Shouldered Hawk

■ The cumulative effects analysis concerning red-shouldered hawk states:

Cumulative effects on private and public uplands in upland hardwood habitat would be similar to those discussed in the goshawks section. Additional RDSH habitat with past activity would include about 90 acres of oak and 15 acres lowland hardwood selection or improvement harvests. Selection cuts retain high canopy closure and can result in an increased tree size in hardwoods, which increases potential for suitable nesting sites. Improvement treatments may have reduced canopy closure enough to make stands unsuitable for RDSH's in the short-term, but generally the canopy fills in over the long-term. Other management that could have affects are those that altered vegetative conditions in riparian areas. There are no records of these activities occurring in the past, present or future. Future harvest activities over the next 15 years on private lands include 12 acres lowland hardwoods, and 600 acres of oak harvest in Marinette County. All these activities would have minimum impact on RDSH habitat due to the harvests methods and long period of time they would occur over. Forest-wide, existing mature hardwood or mixed hardwood/conifer stands continue to provide suitable nesting and foraging habitat for RDSH. Addition of woodland hawk nesting habitat blocks will provide more opportunities for new nest sites. Also, no adverse impacts are anticipated to the birds because only small portions of the forest are disturbed (usually temporarily) each

year. Impacts related to weather, and mammalian predators appear to impact these species more so than human related disturbance.

The cumulative effects of all action alternatives in combination with those activities on private lands would involve a continuation to varying degrees of current vegetation patterns and forest types. Activities would involve disturbances that would likely result in varying levels of both positive and negative habitat alteration. Therefore, the effects from past, present and future actions on private lands, combined with the direct and indirect effects of proposed Alternatives would not negatively impact RDSHs.

(R. DD–3, App. D at 34–35.)

The above discussion is noticeable for its almost complete lack of detail. The Forest Service does not state with any degree of specificity the effect that future logging projects will have on red-shouldered hawk. The agency states only that future logging activities will have a "minimum" effect on habitat but does not discuss what a "minimum" effect might entail. Further, it indicates that the impact of logging on the red-shouldered hawk will not be great because the logging will occur over a "long period of time" but does not provide any more specific information concerning the time frame of the future logging projects. Additionally, the Forest Service predicts that there will be a "continuation to varying degrees of current vegetation patterns and forest types" but does not disclose what it believes those patterns and forest types are. Finally, the agency offers no "quantified or detailed information" relating to the impacts of past projects on the population of red-shouldered hawk. The EIS contains no information about what sites were previously logged and when, what impacts such logging had on the red-shouldered hawk and its habitat, and how much suitable habitat remains. Further,

the Forest Service does not explain why the analysis does not include more detailed information.

As previously discussed, the Regional Forester designated the red-shouldered hawk an RFSS, making it particularly important that the agency satisfy its burden of presenting a reasonably detailed cumulative impacts analysis. However, for the reasons stated above, insofar as it relates to the red-shouldered hawk, the analysis is insufficiently detailed and specific to be "useful to the decisionmaker in deciding whether or how, to alter the program to lessen cumulative impacts." *Lands Council,* 198 F.Supp.2d at 1245. The Forest Service argues that the discussion of red-shouldered hawk is adequate if considered in conjunction with its vegetation analysis. However, the agency's vegetation analysis contains no information about red-shouldered hawk, and even if read in tandem with the discussion of red-shouldered hawk, does not present a clear picture of the cumulative impacts on red-shouldered hawk such that the decisionmaker could alter the project to modify such impacts. In short, the EIS does not give a reasonable reviewer confidence that the agency took a hard look at how the project will affect red-shouldered hawk. The Forest Service also contends that in determining the adequacy of the cumulative impacts analysis I should consider information relating to red-shouldered hawk in the administrative record. (*See* R.2004.) However, I may not do so because deficiencies in an EIS cannot be cured by documents in the administrative record. *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1069 (1st Cir.1980) (holding that "studies or memoranda contained in the administrative record, but not incorporated in any way into an EIS" cannot "bring into compliance with NEPA an EIS that is by itself inadequate").

Thus, for the reasons stated, the Forest Service's cumulative impacts analysis relating to the red-shouldered hawk does not satisfy NEPA.

### b. Northern Goshawk

Insofar as it relates to goshawk, the Forest Service's cumulative impacts analysis states:

Forest management activities over the past 10 years in potential goshawk habitat have been selection harvest of northern hardwoods (7,645 ac.) and even aged management (2,578 ac.). Selection harvests (17% of area) conducted in hardwood stands may have resulted in the loss of potential nesting trees on private lands. Impacts to goshawk on FS lands would be less due to harvest programs on FS land would [sic] have required an analysis of possible effects to goshawk prior to approval of project activities. Selection harvest would temporarily reduce habitat quality by opening the canopy and making the stand unsuitable in the short-term. During this time, goshawks may have used these stands for hunting and nested where forest condition and management emphasize mature forest. In the long term, this harvest method would maintain habitat quality or improving [sic] it by increasing growth in remaining trees and improve prey species diversity. Past aspen management occurred on only 2% of the project area. This may have removed some nesting habitat but would have allowed for more mature aspen stands to remain. However, the lack of aspen management reduces the acres of early successional forest. This intern [sic] can negatively affect hare and grouse populations and the foraging opportunities for goshawks. All these timber harvests were scattered across the landscape and involved low acres over a long period of time. These activities would not have

made conditions unsuitable for goshawks to affect their viability . . .

The cumulative effects of all action alternatives in combination with those activities on private lands would involve a continuation to varying degrees of current vegetation patterns and forest types. Activities would involve disturbances that would likely result in varying levels of both positive and negative habitat alteration. Habitat for prey species would be perpetuated with clearcuts, although probably not to the level found in past decades. Therefore, the effects from past, present and future actions on private lands combined with the direct and indirect effects of proposed Alternatives would not negatively impact goshawks.

(R. DD–3, App. D at 29.)

The above discussion is similar to the agency's discussion of the cumulative impacts on red-shouldered hawk and suffers from the same defects. Most importantly, the discussion is very general and lacking in detail, and it contains no explanation as to why it does not present more detail. For example, the EIS states that the cumulative impacts on goshawk will involve a "continuation to varying degrees of current vegetation patterns and forest types" but does not identify such patterns or describe such forest types. Similarly, the EIS states that the project will reduce habitat quality in the short term but does not indicate what it means by short term or what effect such reduction will have on goshawk. Additionally, the EIS notes that the logging of more than 10,000 acres was "scattered across the landscape and involved low acres over a long period of time," (R. DD–3, App. D at 29), but makes no attempt to indicate how much logging occurred over what period of time, where it took place and what effect it had on goshawk and goshawk habitat. It is also

significant that the EIS contains no details and provides no clear picture concerning the present condition of the goshawk population and its habitat. Like the red-shouldered hawk, the Regional Forester designated the goshawk RFSS making it critical that the Forest Service present a clear picture of the cumulative impacts on this species. The agency argues again that read in conjunction with the vegetation analysis, its goshawk discussion is sufficient. However, for the reasons stated in my discussion of the EIS's analysis relating to red-shouldered hawk, the vegetation analysis does not cure the deficiencies in the Forest Service's analysis relating to goshawk. Similarly, I cannot rely on documents in the administrative record to solve the problem. *Grazing Fields Farm,* 626 F.2d at 1069.

### c. Rare Plants

Plaintiffs also argue that the cumulative impacts analyses relating to various plants, also RFSS, are insufficient. These plants include Mingan's moonwort, goblin fern, blunt-lobed grapefern, Assiniboine sedge, Indian cucumber-root, American ginseng, Braun's holly fern and the foam flower. (*See* R. DD–3, App. D at 43–46, 48–50.) The Forest Service's cumulative impacts analyses relating to these plants are very general. In fact, the cumulative impacts analysis relating to each plant, repeats almost word-for-word the same paragraph:

> Forest-wide, maturing hardwood forest continues to provide more available habitat for [species name inserted]. Conversely, forest-wide activities that occur each year such as timber harvest, road construction, trail use or expansion, etc. cause disturbance of or act as vectors of change to habitat characteristics that are important for this species. These changes may be reversed over time as desirable habitat conditions are restored

> (e.g. when the tree canopy cover returns to pre-disturbance levels).

(*Id.*)

The Forest Service argues that because it believes that the McCaslin project's impacts on the plants will be limited, its boilerplate discussion should suffice. I disagree. Even though a project may not turn out to have an adverse impact on a species, the Forest Service must include enough information in the EIS to demonstrate that it took a hard look at possible cumulative impacts. In the present case, the Forest Service does not indicate how much habitat will be available for each rare plant. Nor does it provide information concerning the impact of logging on each rare plant other than to recognize that timber harvest may "cause disturbance" to "habitat characteristics that are important for this species." Further, the analysis provides no explanation as to why it does not include more detail. Thus, its discussions of the cumulative impacts relating to the plants in question do not satisfy NEPA's standard. This is so even when, as the Forest Service suggests, I consider the vegetation analysis in conjunction with the analysis of each rare plant.

### 4. Listing Past Projects

An EIS must "catalogue adequately the relevant past projects in the area," *City of Carmel–by–the–Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1160 (9th Cir.1997), so that the public will know what projects the agency has considered and so that the decisionmaker will be able to make an informed decision regarding the proposed agency action, *Lands Council,* 198 F.Supp.2d at 1246 (citing *Methow Valley Citizens Council,* 490 U.S. at 349, 109 S.Ct. 1835). Projects "must be described with sufficient specificity to permit adequate review of their cumulative impact." *City of Carmel–by–the–Sea,* 123 F.3d at

1160. According to plaintiffs, the Forest Service failed to adequately catalogue past projects because the EIS "states only the total number of acres of timber cutting, without listing the logging activities and providing essential information for understanding their impacts-for example, the dates on which the logging took place, and the amounts and types of habitat affected by each." (Pls.' Br. at 31.)

■ The EIS provides a variety of general information about past, present and future logging projects, and a discussion of the activities of a number of landowners. (R. DD-3, EIS at 103–05.) However, it discusses past timber projects only collectively. (*See, e.g.,* R. DD-3, EIS at 104) (noting that since 1990, approximately "798 acres of even-aged regeneration, 1,557 acres of thinning, and 471 acres of selection harvest have taken place"). Nowhere does the Forest Service list or otherwise catalogue past projects. Thus, neither the public nor the decisionmaker can discern what individual projects the agency considered when it conducted the analysis. As a result, the EIS does not satisfy NEPA. *See Lands Council,* 379 F.3d at 744 (finding an EIS insufficient when it did not individually list past timber harvests). Although the administrative record includes more specific information concerning individual past activities in the project area, (*see* R. 277–308, 402–16, 1757–60, 1764, 1783, 6882–7113), documents in the administrative record may not cure a deficiency in the EIS. *Grazing Fields Farm,* 626 F.2d at 1073.[8]

## B. Consideration of Scientific Information

■ Agencies "shall discuss at appropriate points in the final statement any responsible opposing view ... and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). "This disclosure requirement obligates the agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken." *Ctr. for Biological Diversity,* 349 F.3d at 1167 (citing 40 C.F.R. at § 1500.1(b)). If the information opposes the agency's conclusions, the agency must make "a good faith reasoned response to it." *Seattle Audubon Soc'y v. Lyons,* 871 F.Supp. 1291, 1318 (W.D.Wash.1994). However, an agency does not violate the requirement unless the opposing viewpoints "directly challenge the scientific basis upon which the final EIS rests and which is central to it." *See Ctr. for Biological Diversity,* 349 F.3d at 1167; *see also Mid–States Coalition for Progress v. Surface Transp. Bd.,* 345 F.3d 520, 548 (8th Cir.2003) (noting that "flyspecking" an EIS for "inconsequential or technical mistakes" is inappropriate). In making decisions, agencies must also rely on high quality information. *See* 40 C.F.R. § 1500.1(b) (requiring that environmental information be of "high quality").

■ In the present case, plaintiffs contend that the Forest Service failed to consider and respond to several experts' statements, which plaintiffs contend oppose those in the EIS. First, plaintiffs contend that the agency failed to respond to several of Dr. Tom Doolittle's statements including his statement that "forty-eight percent of all stands containing a goshawk nest on U.S. Forest Service lands are no longer suitable for occupancy due to anthropogenic disturbances," (R. 2286).

8. I reach no conclusion as to whether the documents in the administrative record would correct the deficiency in the EIS. Rather, in concluding that the Forest Service failed to adequately catalogue past, present, and reasonably foreseeable projects, I have not considered such documents.

However, such statement does not specifically relate to the McCaslin project and, therefore, did not require a response. Plaintiffs also argue that the agency should have responded to Doolittle's conclusion that "potential [goshawk] habitat could be affected by any harvest other than light selection cutting, due to the altering of the canopy cover and effects on foraging habitat." (R. 7305–06.) Plaintiffs contend that Doolittle's opinion contradicts certain conclusions in the EIS including those that the selection harvest[9] would have minimal affects on goshawk nesting habitat because canopy closure would remain high after harvest and that thinning[10] would make the stand unsuitable for only several years. (R. DD–3, App. D at 27.) However, the EIS states that clear-cutting in goshawk habitat "could remove potential [goshawk] nesting habitat for several decades," (id.), and that "[s]election harvest would temporarily reduce habitat quality by opening the canopy and making the stand unsuitable in the short term," (id. at 29), thus, Doolittle's conclusion cannot be considered "opposing" information such that the Forest Service had to directly address it.

■■■ Plaintiffs also argue that Dr. Tom Erdman and Dr. Paul Beier conclude that goshawk will not be able to find prey in sunlit clear-cut areas because of thick vegetation growth and that such conclusion opposes the EIS's view that the project will make prey more abundant and thus benefit goshawk. However, fairly interpreted, the EIS does not imply that an increase in prey will result in an increase in the goshawk population. However, Erdman and Beier's conclusions that go-shawk will not be able to find prey in sunlit clear-cut areas because of thick vegetation growth do oppose information in the EIS. The EIS implies that clear-cut areas will benefit goshawk by positively impacting their "foraging opportunities." (Id.) However, even though the EIS does not discuss Erdman and Beier's conclusions, I do not conclude that the omission violates NEPA because there is no indication that the possibility that clear-cutting would increase foraging opportunities influenced the agency's choice of an alternative for the McCaslin project. See Mid States Coalition for Progress, 345 F.3d at 548 (noting that "fly-specking" an EIS for "inconsequential or technical mistakes" is inappropriate).

Plaintiffs also argue that the agency ignored biologists'[11] studies concluding that "[s]elective cutting . . . could possibly open habitats currently used by red-shouldered hawks to competition with red-tailed hawks" and that "[a]s harvest of the Midwestern forests continues, the Red-shouldered hawk undoubtedly will lose some of its optimum habitat, allowing competition and replacement by the larger red-tailed hawk." (R. 1596.) However, the EIS appears to acknowledge at least some of the possible effects of the project on red-shouldered hawk in that it states that "[s]election harvest would temporarily reduce habitat quality by opening the canopy and making the stand unsuitable in the short term." (R. DD–3, App. D at 29.) Thus, the biologists' conclusion cannot be said to constitute opposing evidence.

Plaintiffs also contend that the EIS fails to address Dr. John Jacobs's study indicat-

---

9. Selection harvest is "[t]he removal of trees from certain size and age classes over an entire stand area. Regeneration is mainly natural, and an uneven aged stand is maintained." (R. DD–3, Glossary at 8.)

10. Thinning is "a cutting made in an immature stand of trees to accelerate growth of the remaining trees or to improve the form of the remaining trees." (R. DD–3, Glossary at 11.)

11. The biologists include Bednarz, Bryant, Dijak, and Dinsmore.

ing that red-shouldered hawk reproduce at a low rate due to a lack of "mature forest habitat," [12] (R.2091), and recommending a new "ecological approach to National Forest management that would maintain fifty percent of forest in 'contiguous, closed canopy, mature, native forest communities.'" (R.2057.) However, Jacobs's study does not directly address the McCaslin project. Moreover, the EIS acknowledges the concern about the viability of red-shouldered hawk. Plaintiffs also claim that the agency should not have relied on a private communication from Jacobs. However, this argument is not compelling because the EIS discloses his name, qualifications and the substance of the communication, thus permitting interested parties to verify it. *See San Francisco Baykeeper v. U.S. Army Corps of Eng'rs*, 219 F.Supp.2d 1001, 1015 (N.D.Cal.2002) (allowing agency to rely on private communications where EIS disclosed identities and qualifications of individuals making such communications).

Plaintiffs also contend that the Forest Service failed to satisfy the requirement that agencies "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements," 40 C.F.R. § 1502.24, by relying on "high quality" information. *Id.;* 40 C.F.R. § 1500.1(b). Plaintiffs allege that the Forest Service failed to satisfy this requirement by relying on information in the 1986 forest plan rather than more recent information. *See Sierra Club v. U.S. Dep't of Agric.*, No. 94–CV–4061, 1995 U.S. Dist. LEXIS 21507, at *39–40 (S.D.Ill. Sept. 25, 1995) (holding that the Forest Service violated 40 C.F.R. §§ 1500.1(b) and 1502.24 by relying on 10–year–old data regarding bird populations when more recent data existed). Howev-

er, plaintiffs' argument fails because the record indicates that the agency relied on a variety of information, not only that in the 1986 forest plan. (R. DD–3, EIS at 159–64.)

## V. NFMA CLAIMS

■ "NFMA requires the Secretary of Agriculture to develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." *Biodiversity Assocs. v. U.S. Forest Serv.*, 226 F.Supp.2d 1270, 1278 (D.Wyo.2002); 16 U.S.C. § 1604. A plan governs each forest and must "provide for multiple use and sustained yield ... includ[ing] coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). "In developing the plans, the Forest Service must take both environmental and commercial goals into account." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *see also Biodiversity Assocs.*, 226 F.Supp.2d at 1278 (same). In a final plan, the Forest Service divides a forest into management areas and describes how it will manage resources in each of these areas. The agency must revise each plan every fifteen years or when conditions within the forest significantly change. 16 U.S.C. § 1604(f)(5)(A). After creating a forest plan, the Forest Service implements it by considering and adopting individual forest projects, 16 U.S.C. § 1604(i), which must be consistent with the forest plan and which also are subject to analysis under NEPA. *Id.; see also Neighbors of Cuddy Mountain*, 137 F.3d at 1377 (stating that under NFMA, the Forest Service must "demonstrate that a site-specific project would be consistent

**12.** Jacobs defines mature forest habitat as "wet, 50–350 years old, 90–120 trees per acre, 8–15 d[iameter] b[reast] h[eight]." (R.2095.)

with the land resource management plan for the entire forest").

## A. Reliance on 1986 Plan

Plaintiffs claim that the Forest Service violated NFMA by analyzing the McCaslin project under the 1986 plan rather than the 2004 plan. They contend that new science and changed conditions caused the 1986 plan to become outdated. The agency responds that plaintiffs' claim is moot because it updated its analysis with a Supplemental Information Report ("SIR"), which found the project to be consistent with the 2004 plan. However, plaintiffs deny that the claim is moot arguing that the 2004 plan is more environmentally friendly than the 1986 plan and that the agency could not definitively determine whether the project was truly consistent with the 2004 plan's goals,[13] objectives,[14] standards[15] and guidelines,[16] merely by updating its analysis under the 1986 plan. (*See* SIR at 1) (noting that it discussed the project's consistency with the 2004 plan's goals and objectives only where they "relate[d] to a substantial difference in environmental impacts that were disclosed" in the EIS). Rather, they assert that the Forest Service should have started from scratch and conducted a new analysis.

 A case is moot when it no longer presents a live case or controversy. *See Bd. of Educ. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L.,* 89 F.3d 464, 467 (7th Cir.1996). "Action by the defendant that simply accords all the relief demanded by the plaintiff" may render an issue moot. 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3533.2 at 238 (2d ed. 1984 & Supp.2004). In other words, "[s]o long as nothing further would be ordered by the court, there is no point in proceeding to decide the merits." *Id.* As the foregoing discussion indicates, plaintiffs' claim that the Forest Service erred in approving the McCaslin project under the 1986 plan is not moot because the agency did not provide "all the relief demanded by plaintiff," *id.,* i.e., it did not conduct a complete analysis of the project under the 2004 plan.

 Therefore, I must address whether NFMA authorized the Forest Service to analyze the McCaslin project under the 1986 forest plan while revising that plan. Plaintiffs argue that § 1604(f)(5)(A), which requires a forest plan to "be revised ... from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years," suggests a negative answer. However, such provision does not prohibit the Forest

13. Goals are "broad statements describing conditions the forests will strive to achieve" although there are "no specific time frames for achieving them." (2004 LRMP at 1–1.) In the 2004 plan, one of the goals is to "ensure healthy and sustainable ecosystems for endangered, threatened and sensitive species." (*Id.* at 1–2.)

14. Objectives are "time-specific statements of planned results or outcomes responding to established goals." (2004 LRMP at 1–1.) In the 2004 plan, one of the objectives is to "implement established recovery or conservation strategies" under the Endangered Species Act. (*Id.* at 1–2.)

15. A standard is a "course of action that must be followed, or a level of attainment that must be reached to achieve forest goals." (2004 LRMP at 2–1.) For example, one of the standards in the 2004 forest plan is to "[p]rotect hydrologic function and maintain natural hydrologic regimes." (*Id.* at 2–3.)

16. A guideline is also a "course of action that must be followed. However, [g]uidelines relate to activities where site-specific factors may require some flexibility." (2004 LRMP at 2–1.) One of the guidelines in the 2004 plan is to "[e]nsure revegetation of log landings after project activities are completed, either through artificial means or natural revegetation." (*Id.* at 2–2.)

Service from relying on a plan that it is revising because fifteen years have expired or because conditions within a forest have significantly changed. Section 1604(f)(5)(A) does not require the agency to cease forest management activities, including analyzing proposed timber sales while it is formulating a new forest plan.[17] Moreover, other sections of NFMA, 16 U.S.C. §§ 1604(c) and 1604(i), reflect congressional intent to permit the Forest Service to manage a forest while it is revising its forest plan. Section 1604(c) provides that "[u]ntil such time as a unit of the National Forest System is managed under plans developed in accordance with this Act, the management of such unit may continue under existing land and resource management plans." 16 U.S.C. § 1604(c); *see also Biodiversity Assocs.*, 226 F.Supp.2d at 1302 (noting that "[w]hile 1604(c) was directed at governing the state of affairs at the time NFMA was enacted, it is evidence that Congress never intended that the statute and its provisions should have the effect of ceasing all operations in a National Forest when a plan was not … timely revised").

■ Further, § 1604(i) provides that: Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.... When land management plans are revised, resource plans and permit contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

16 U.S.C. § 1604(i). Thus, when the agency revises a forest plan, it must also revise resource plans and other instruments, including plans for timber sales, that it approved under the old plan. *See Friends of S.E.'s Future v. Morrison*, 153 F.3d 1059, 1068 (9th Cir.1998) (noting that § 1604(i) applies to plans for timber sales). Therefore, "Congress recognized that things should continue to progress while a plan is in the process of revision, and that planning is an ongoing process, where the circumstances continue to change" and that plans and documents that rely on a forest plan "shall continually be in flux as well." *Biodiversity Assocs.*, 226 F.Supp.2d at 1302–03 (also stating that "Congress did not intend that missed statutory deadlines within NFMA would halt all action on the National Forests"); *see also* Pub.L. No. 108–108, § 320; 117 Stat. 1241 (2003) (providing that where the agency violates § 1604(f)(5)(A), a court should order it to revise the forest plan rather than enjoin ongoing management of a forest); *see also Sierra Club v. Bosworth*, 352 F.Supp.2d 909, No. 03–3572, 2005 U.S. Dist. LEXIS 1336, at *26 (D.Minn. Jan. 14, 2005) (noting that there is support for the proposition that a forest plan remains in effect until the effective date of its revision). Plaintiffs point out that the *Biodiversity Associates* court focused only on "the remedy for failure to revise the Plan within fifteen years," 226 F.Supp.2d at 1301, whereas in the present case, conditions in the forest had significantly changed. However, no section of NFMA suggests that there should be a different remedy for failing to revise a plan within fifteen years and failing to revise a plan because of changed conditions.

---

17. Plaintiffs also suggest that the Forest Service rushed to approve the McCaslin sale under the 1986 plan. (R. 827) (disclosing an agency higher-up's statement that the agency was "under a lot of pressure" and that

"[h]olding off until the [2004] revision is completed would not be acceptable" to Forest Service leadership). However, as I will discuss, the agency may manage a forest while revising its plan.

Thus, the Forest Service did not violate NFMA by analyzing the McCaslin project under the 1986 plan and updating the analysis under the 2004 plan.

## B. Road Density Standards

■ Plaintiffs also argue that roads in the area within the McCaslin project exceed the 1986 plan's road density standards. Under such standards, different management areas ("MAs") of the forest must not have more than a specific amount of "open improved roads" per square mile of forest. However, the Forest Service only violates a road density standard if the average road density for the entire MA is exceeded. The McCaslin project is not congruent with any MA and overlaps a number of them. Plaintiffs' argument fails because they produce no evidence that the average road density for any one MA exceeds the standard in the 1986 plan. Further, as the Forest Service correctly notes, the road density standards in the 1986 plan apply to "open improved roads." However, Table 4.9–8 in the EIS, on which plaintiffs rely, calculates road density in the McCaslin area based on "all measurable open roads within the project area." (R. DD–3, EIS at 133.) For this reason also, plaintiffs' argument fails.

## VI. CONCLUSION

As discussed above, the Forest Service failed to satisfy the requirements of NEPA by failing to consider all of the relevant factors including the five other logging projects in determining the geographic scope of the area in which to conduct the cumulative impacts analysis and by failing to take a hard look at the cumulative impacts. The Forest Service appropriately addressed opposing scientific information and did not rely solely on inadequate information. Further, the Forest Service did not violate NFMA either by assessing the McCaslin project under the 1986 forest plan and updating the analysis under the 2004 plan or by violating the plan's road density standards.

## VII. REMEDY

■ When a court finds that an agency has failed to satisfy the requirements of NEPA, it may but is not required to enjoin further action on the project under review. *Wisconsin v. Weinberger*, 745 F.2d 412, 428 (7th Cir.1984) (rejecting presumption that injunction should issue upon a violation of NEPA). "Although the goal of NEPA is to force agencies to consider the environmental consequences of major federal actions, . . . that goal is not to be achieved at the expense of countervailing public interests." *Id.* at 426. Thus, "[t]raditional equity standards govern whether or not to grant injunctive relief in a NEPA case."[18] *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F.Supp.2d 962, 977 (S.D.Ill.1999). Generally, courts employ a four-factor balancing test to determine whether to issue an injunction, the elements of which are: (1) "that legal remedies are inadequate;" (2) "that not granting the injunction would result in irreparable injury;" (3) "that the balance of effects on each party of granting or not granting the relief weigh in favor of the movant;" and (4) "that the injunction is in the public interest." Leslye A. Herrmann, *Injunctions for NEPA Violations: Balancing the*

---

18. *But see Heartwood, Inc.*, 73 F.Supp.2d at 978 (noting that the balancing test may not need to be used in NEPA cases because NEPA requirements implicate public health and when the issues in a case involve public health "injunctive relief is proper, without resort to balancing"); Sarah W. Rubenstein, *Injunctions Under NEPA after Weinberger v. Romero–Barcelo and Amoco Production Co. v. Village of Gambell*, 5 Wis. Evntl. L.J. 1 (1998) (indicating that the lower courts are not in agreement on whether to and how to apply the traditional equitable balancing test in NEPA cases).

*Equities,* 59 Univ. of Chi. L.Rev. 1263, 1271 (1992) (citing *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

In cases involving environmental injury, legal remedies are usually inadequate. *See U.S. Envtl. Prot. Agency v. Envtl. Waste Control, Inc.,* 917 F.2d 327, 332 (7th Cir.1990) (noting that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages"). This is so in the present case. Money damages would not compensate for the loss of goshawk and red-shouldered hawk or their habitat. Moreover, environmental injury is often irreparable. *See id.* (noting that environmental injury is "often permanent or at least of long duration, i.e., irreparable"). Courts have recognized that logging such as would occur as the result of the McCaslin timber sale can have long-term environmental consequences and thus satisfy the irreparable injury criterion. *See Idaho Sporting Cong., Inc.,* 222 F.3d at 569 (noting that the imminent and continuing logging activities presented "evidence of environmental harm ... sufficient to tip the balance in favor of injunctive relief"); *see also Neighbors of Cuddy Mountain,* 137 F.3d at 1382 (stating that "[t]he old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce") (internal citation omitted).

■ However, an environmental injury must be sufficiently likely to occur for it to be considered "irreparable." If the environmental injury is sufficiently likely to occur, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Idaho Sporting Cong., Inc.,* 222 F.3d at 569 (citing *Amoco Prod. Co.,* 480 U.S. at 545, 107 S.Ct. 1396). Thus, in the present case, the question of irreparable injury depends on the likelihood of the injury occurring. It is undisputed that the Forest Service plans to harvest timber within goshawk and red-shouldered hawk habitat and that at least in the short term, harvesting will negatively affect such habitat. I conclude that this irreparable harm is sufficiently likely, especially when coupled with "the added risk to the environment that takes place when governmental decision makers make up their minds without having before them [a NEPA compliant] analysis ... of the likely effects of their decision upon the environment." *Heartwood, Inc.,* 73 F.Supp.2d at 978–79 (citing *Conservation Law Found., Inc. v. Busey,* 79 F.3d 1250, 1271–72 (1st Cir.1996)).

Further, the relative absence of harmful effects on the Forest Service weighs in favor of granting the injunction. Although it will have to expend additional time, effort and resources in order to produce a NEPA compliant EIS, the Forest Service has presented no evidence that an injunction would result in excessive delay or excessive costs resulting from delay. *See Weinberger,* 745 F.2d at 427 (implying that granting an injunction would be inappropriate because it would result in excessive delay in implementing a national defense project). Thus, the potential costs to the Forest Service in this case do not weigh heavily against an injunction.

Finally, paying "particular regard for the public consequences in employing the extraordinary remedy of injunction," I cannot conclude that the public interest weighs against issuing an injunction. *Heartwood, Inc.,* 73 F.Supp.2d at 977 (citing *Weinberger,* 745 F.2d at 425). The public has an interest in both the issuance and the denial of the injunction. Courts have recognized that "it is not even arguable that violations by federal agencies of NEPA's provisions as established by Congress harm the public as well as the environment." *Id.* at 979; *Fund for Animals, Inc. v. Espy,* 814 F.Supp. 142, 152 (D.D.C.

1993) (noting that the public has an interest in compliance with the law as expressed by Congress). Additionally, in a case such as this, where hundreds of acres of goshawk and red-shouldered hawk may be affected, the public's use, enjoyment and the health benefits of the lands and resources affected could be irreparably harmed. *Heartwood, Inc.*, 73 F.Supp.2d at 979. In contrast, the public also has an interest in agency efficiency and "avoiding unnecessary paperwork and agency man-hours" and may also have an economic interest in the timber produced from the McCaslin sale. Agencies, however, "can find cost-effective methods of conducting their business and all can continue to operate" once the Forest Service issues an EIS that complies with NEPA. *Id.* at 980. Thus, the public's economic interest is not enough to prevent the issuance of the injunction. The potential irreparable injury to the public from allowing the McCaslin timber sale to proceed on the basis of an inadequate EIS is far greater than the potential harm to the public caused by issuing the injunction.

For the foregoing reasons, I will enjoin the Forest Service from implementing the McCaslin timber sale until it produces a NEPA compliant EIS.

## VIII. ORDER

Therefore, as outlined above,

**IT IS ORDERED** that with respect to the sufficiency of the cumulative impacts analysis, plaintiffs' motion to reverse is **GRANTED**, and the Forest Service's motion to affirm is **DENIED**.

**IT IS FURTHER ORDERED** that with respect to addressing opposing scientific information, analyzing the McCaslin project under the 1986 plan with an update relating to the 2004 plan and complying with road density standards, the Forest Service's motion to affirm is **GRANTED**, and plaintiffs' motion to reverse is **DENIED**.

**FINALLY, IT IS ORDERED** that this case is **REMANDED** to the Forest Service for proceedings consistent with this opinion and that the McCaslin project is **ENJOINED** until such time as the EIS complies with NEPA.